IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Brandy J.,[1]                                              No. 6:23-cv-00472-HZ

                      Plaintiff,                          OPINION & ORDER

        v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                      Defendant.

Mark A. Manning
Katherine Eitenmiller
Wells, Manning, Eitenmiller & Taylor, P.C.
474 Willamette St
Eugene, OR, 97401

        Attorneys for Plaintiff

Kevin C. Danielson
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Katherine B. Watson
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Brandy J. brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income ("SSI"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court reverses the Commissioner's decision and remands this case for further administrative proceedings.

## PROCEDURAL BACKGROUND

      Plaintiff applied for SSI on May 7, 2019, alleging an onset date of May 7, 2019. Tr. 16.[2] Her application was denied initially and on reconsideration. Tr. 16.

      On January 7, 2022, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 16. On April 21, 2022, the ALJ found Plaintiff not disabled. Tr. 26. The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

      Plaintiff alleges disability based on lupus, liver failure, post-traumatic stress disorder (PTSD) and bipolar disorder. Tr. 240. At the time of her alleged onset date, she was 34 years old. Tr. 25. She has a limited education and no past relevant work. Tr. 25.

//

//

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 7.

**SEQUENTIAL DISABILITY EVALUATION**

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to

the Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the

Commissioner meets their burden and proves that the claimant can perform other work that

exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her alleged onset date. Tr. 18. Next, at steps two and three, the ALJ determined that

Plaintiff has the following severe impairments: "depressive disorder; PTSD; probable borderline

personality disorder; stimulant use disorder, in sustained remission, opioid use disorder, in

sustained remission." Tr. 18. However, the ALJ determined that Plaintiff's impairments did not

meet or medically equal the severity of a listed impairment. Tr. 19. At step four, the ALJ

concluded that Plaintiff has the residual functional capacity to perform a full range of work at all

exertional levels with the following nonexertional limitations:

> The claimant can understand, remember, carry out and persist at simple, routine,
> repetitive tasks. The claimant can make simple work-related decisions, perform
> work with few if any changes in the workplace, and engage in no assembly-line
> pace work. The claimant is able to have occasional public contact and occasional
> close coworker interaction.

Tr. 21. The ALJ found that Plaintiff had no past relevant work. Tr. 25. But at step five, the ALJ

found that there are jobs that exist in significant numbers in the national economy that Plaintiff

can perform, such as "Lot Attendant," "Busser," and "Office Cleaner." Tr. 25. Thus, the ALJ

concluded that Plaintiff is not disabled. Tr. 26.

//

//

**STANDARD OF REVIEW**

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

**DISCUSSION**

Plaintiff asserts that the ALJ erred by (1) rejecting her subjective symptom testimony; (2) rejecting the lay testimony of her mother; and (3) finding the medical opinions of Sergiy Barsukov, PsyD, and Danielle Guthrie, DO, less than fully persuasive. Pl. Op. Br. 5, ECF 10. The Court concludes that the ALJ erred in rejecting this evidence and remands for further proceedings.

**I.    Subjective Symptom Testimony**

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom

evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other grounds). First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Plaintiff worked as a prep cook and housekeeper over 15 years ago. Tr. 47. She testified that she had not worked in the last 15 years because she suffered a sexual assault and other difficulties that caused "a lot of problems." Tr. 47. Plaintiff testified that in May 2021, she tried to work as a telemarketer, but only lasted a few days because "I couldn't mentally handle it." Tr. 46. She was not fired, but she got in trouble for being unable to focus or understand things. Tr. 46. Plaintiff stated that she had not applied for other jobs since. Tr. 47.

Plaintiff testified that she completed only part of ninth grade and had tried to get her GED several years ago but was unsuccessful. Tr. 45-46. She stopped going to school because she got into fights and "I was raped a few times." Tr. 53. She testified that she had trouble understanding things and focusing at school. Tr. 53.

Plaintiff testified that she had been sober from meth and heroin for "[a] little over a year." Tr. 43-44. She went through an in-home treatment program. Tr. 44. She went to recovery meetings about twice a month. Tr. 44. She was taking methadone. Tr. 48. She had not had a positive urinalysis test. Tr. 52. Plaintiff testified that she lived with her daughter and her daughter's father. Tr. 45. Her daughter was recently returned to her custody after spending time in foster care because Plaintiff had briefly been homeless. Tr. 43.

Plaintiff testified that she was taking Cymbalta. Tr. 48. She did not have side effects. Tr. 48. She went to see a counselor "[o]ff and on." Tr. 48. At the time of her hearing, it had been about three and a half months since her last appointment. Tr. 49. She stated that she needed to resume regular counseling. Tr. 50.

Plaintiff testified that she would become very angry and feel that people were out to get her. Tr. 53-54. When she became anxious, sometimes she would get angry. Tr. 54. She explained that she would also have mental breakdowns in which she would get "shaky" and "clammy" and "shut down." Tr. 54. She would be unable to focus or remember things during these breakdowns. Tr. 54. She would think people were after her. Tr. 54. She would cry. Tr. 54. She testified, "I take things to the extreme." Tr. 55. She testified that when she was trying to work at the call center, she "kept freaking out" and needed a lot of help. Tr. 56.

Plaintiff explained that her anxiety could be triggered by certain smells. Tr. 59. She often had nightmares. Tr. 59. Her partner and daughter had both seen her convulsing while she slept.

Tr. 59. She wrote in her function report that she could pass out from anxiety. Tr. 249. Her symptoms could happen suddenly and be triggered by small things. Tr. 256.

Plaintiff testified that on a typical day she would stay home. Tr. 56. She would sometimes make bracelets with her daughter, but she mostly just watched TV. Tr. 56. She had no friends and did not communicate with her family. Tr. 56. Her family told her that they could not keep communicating with her because it was "too much" because of Plaintiff's mental health issues. Tr. 57. Plaintiff stated that she did not interact with anyone socially online either. Tr. 57. In her function report, she wrote that she had "a severe issue with being in public." Tr. 249. She also wrote that she did not interact socially anymore, and that people were rude and judgmental toward her because of her mental health. Tr. 254.

Plaintiff testified that she did not drive. Tr. 44. She relied on the local medical transport to go to medical appointments and go shopping. Tr. 44-45. In her function report, she wrote she could not go out alone because she would panic and forget where she was going and what she needed to do. Tr. 252. Plaintiff wrote in her function report that she enjoyed fishing and would go with her family. Tr. 253. She also went to church and to her recovery group. Tr. 253.

Plaintiff testified that she was "getting better at" chores such as laundry and preparing simple meals. Tr. 47. She said that she showered "maybe once every three days" and did not brush her teeth every day. Tr. 58. She wrote in her function report that she had lost interest in cleaning herself and did not care what her hair looked like. Tr. 251. She testified at the hearing that she usually prepared meals such as ramen noodles or baked chicken with her partner and daughter. Tr. 58. She sometimes had trouble cooking on her own because she would get anxious and shake. Tr. 58. In her function report, she indicated that she cooked breakfast for her family and also prepared lunch and dinner, and did not have trouble feeding herself. Tr. 250-251. She

wrote that she could prepare multi-course meals. Tr. 251. She also wrote that she could make

beds, do laundry, clean the house, and do dishes. Tr. 250. She did chores and cooked daily, and

these activities took between two and five hours. Tr. 252. However, she also wrote that she

needed encouragement to do them, or she would not care, and she would lose focus. Tr. 252. She

indicated that she did not handle stress or changes in routine well. Tr. 255. She had a fear of

dying. Tr. 255.

Plaintiff wrote in her function report that she needed to make a calendar for herself or she

would forget to take her medication. Tr. 251. She indicated that she could handle her finances.

Tr. 253. She indicated that she had limitations in memory, concentration, understanding, and

completing tasks. Tr. 254. Plaintiff stated that she did not finish what she started, that she did not

follow written instructions very well, and that she could follow spoken instructions if they were

clearly and slowly stated. Tr. 254.

The ALJ concluded that "the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record[.]" Tr. 22. The ALJ

discounted Plaintiff's testimony based on her activities and the medical record. Tr. 22-23.

A.  Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason

for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

There are two grounds for using daily activities to support an adverse credibility determination:

(1) when activities meet the threshold for transferable work skills, and (2) when activities

contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). In

order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

In discounting Plaintiff's testimony about her adaptive functioning and attention span, the ALJ relied on Plaintiff's report to the consultative examiner, Dr. Guthrie, that she could independently perform her activities of daily living, and her mother's report that Plaintiff could do household chores for two or three hours at a time, four times per week. Tr. 22 (citing Tr. 1158-1164, 273). The ALJ also noted that Plaintiff's mother stated that Plaintiff could shop in stores for three to four hours at a time a few times per month. Tr. 22. In discounting Plaintiff's testimony about her difficulty focusing and concentrating, the ALJ noted that Plaintiff's mother reported that Plaintiff could handle her finances. Tr. 22 (citing Tr. 274). The ALJ discounted Plaintiff's testimony about her social limitations by stating that Plaintiff could "spend time with others by fishing, swimming, watching movies, going to church, and going to the lake with her family." Tr. 22 (citing Tr. 275). In discounting Plaintiff's testimony about her ability to

understand and follow instructions, the ALJ noted that Plaintiff's mother reported that Plaintiff could follow written and spoken instructions well. Tr. 22 (citing Tr. 276).

Plaintiff first argues that the ALJ's conclusion is illogical because the ALJ relied on the third party statement in finding the third party statement not fully reliable. Pl. Op. Br. 17-18. The ALJ's reasoning is apparent from the decision, so the Court proceeds to evaluate the validity of that reasoning. As to the ALJ's reliance on Dr. Guthrie's report, Dr. Guthrie stated that Plaintiff was "independent with ADLs" but she "sometimes struggles when going out in public, grocery shopping. Can get panicky, depending on the situation." Tr. 1160. The ALJ reasonably relied on this evidence to discount Plaintiff's testimony that she struggled with personal grooming and household chores. It is consistent with her testimony about going out in public. Plaintiff asserts that the ALJ ignored part of her mother's statement, as her mother reported that Plaintiff needs motivation to do chores. Pl. Op. Br. 18. Plaintiff's mother wrote that Plaintiff could do chores, but that she needed motivation to do them, and "if not, she's too depressed to care or her body is too sore to move." Tr. 273. This is consistent with Plaintiff's testimony that she could do chores but needed encouragement. Tr. 252. The ALJ reasonably concluded that Plaintiff's ability to do basic activities of daily living in the home was better than she claimed.

As for Plaintiff's ability to manage her finances, it is unclear how her ability to do brief tasks such as paying bills or counting change contradicts her testimony that she would lose focus. But the ALJ reasonably relied on Plaintiff's mother's testimony that Plaintiff followed instructions well in discounting Plaintiff's testimony that she struggled to follow instructions.

As for social interactions, while the ALJ correctly noted that Plaintiff's mother reported that Plaintiff could do various social activities, Plaintiff's mother also wrote that Plaintiff did not go out as much anymore and usually was depressed and cried a lot. Tr. 275. Plaintiff's mother

wrote that Plaintiff had trouble reaching out and being in public places because of her trauma, and that she had trouble trusting others. Tr. 271. The ALJ could reasonably conclude from this testimony that Plaintiff could go out a bit more often than she claimed, but Plaintiff's mother's testimony does not differ significantly from Plaintiff' testimony. In sum, the ALJ partially erred in discounting Plaintiff's testimony based on her activities.

B. Objective Medical Evidence

An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).

The ALJ briefly reviewed Plaintiff's mental health treatment record. Tr. 22-23. The ALJ noted that around the time of her alleged onset date (in May 2019), Plaintiff sought treatment for her anxiety, depression, PTSD, and concentration issues. Tr. 22. In May 2019, Plaintiff was

assessed for mental health treatment. Tr. 315-324. She reported a lifelong history of verbal psychological, and sexual abuse. Tr. 319. She reported that she sometimes saw dark flashes that she believed were blocking memories of past abuse. Tr. 320. She had attempted suicide in the past, but was not suicidal on the date of assessment. Tr. 321. She did not want to be involved with old friends and wanted to worry about herself. Tr. 320. She enjoyed being outdoors and going bowling. Tr. 320. She reported hearing a voice. Tr. 323.

Plaintiff's appearance was remarkable and congruent to the situation and climate. Tr. 322. Her behavior was congruent to the content of the conversation; Plaintiff was tearful, cooperative, and pleasant. Tr. 322. Her speech was unremarkable, but her thought content was remarkable for perseveration. Tr. 322-323. Her memory showed impaired retention or immediate recall. Tr. 323. Her intellectual functioning showed a deficit in general knowledge. Tr. 323. She displayed sensitivity to sound. Tr. 323. Her mood was depressed. Tr. 323. She was oriented. Tr. 323. Her insight was limited, but her judgment was unremarkable. Tr. 323. The provider concluded that Plaintiff had symptoms of PTSD, anxiety, and depression that needed to be treated. Tr. 315-317.

Plaintiff's mental health concerns appear in the record before her alleged onset date. In January 2019, for example, Plaintiff reported that she often became angry and believed that her father was using her mental health conditions against her. Tr. 520. She was alert but showed some flight of ideas and was difficult to keep on track; she was easily agitated. Tr. 521. She appeared fatigued. Tr. 521. Her memory was intact. Tr. 521. At another appointment in January 2019, Plaintiff was alert and cooperative, with fluent speech, but she was agitated and had an irritable mood, and her affect was anxious, angry, tearful, and hostile toward her father, who accompanied her to the appointment. Tr. 524.

During several appointments (primarily addressing Plaintiff's physical conditions) between February and June 2019, Plaintiff's mental status was unremarkable upon examination. Tr. 401, 422, 443-447, 518, 610, 637. However, in April 2019, a provider noted that Plaintiff appeared confused about the entire process of her drug rehabilitation. Tr. 625. She had severe depression, a depressed affect, and was anxious and easily distracted and agitated. Tr. 629. And in July 2019, Plaintiff reported that she had thought she saw spiders crawling up the wall for a few days. Tr. 460. Her mood and affect were normal upon examination, but providers noted hallucinations. Tr. 460, 462. In November 2019, Plaintiff's affect was recorded as anxious and abnormal, and she insisted to her provider that her X-ray could not be normal and that she must be dying. Tr. 513.

In March 2020 at an appointment addressing her physical health conditions, Plaintiff was alert and oriented, but had an abnormal affect and was irritable. Tr. 505. At another appointment that month, she reported numerous symptoms, including anxiety, panic, racing thoughts, frustration or irritability, fatigue, difficulty concentrating, rapid mood shifts, an inability to make decisions, and feeling distant from others. Tr. 563. Her appearance was appropriate, her behavior cooperative and dramatic, her thoughts clear and coherent. Tr. 564. However, Plaintiff showed obsessions as well as olfactory, visual, and auditory disturbances. Tr. 564. Her affect was depressed, her mood anxious and depressed. Tr. 564. Her insight was adequate and her judgment fair. Tr. 564.

In May 2020, Plaintiff reported having no friends or support system. Tr. 701. She displayed severe symptoms of depression and moderate symptoms of anxiety. Tr. 705. Her symptoms included paranoia, racing thoughts, and a history of auditory hallucinations. Tr. 705. Plaintiff's stated goal was to stop "feeling crazy." Tr. 705. At another appointment in May 2020,

Plaintiff expressed worry that people would listen in on the conversation. Tr. 867. She was very

teary and anxious, but she was oriented and her memory was normal. Tr. 867-868. Plaintiff told

another provider that she had visual hallucinations on and off for a month and had

nightmares most nights. Tr. 862.

In July 2020, Plaintiff reported feeling isolated, overwhelmed, and stuck. Tr. 718. She

was referred for follow-up on her anxiety and emotional reactivity. Tr. 849. She reported that she

had recently gone to the ER because she felt "weird" and "incoherent" and had panicked. Tr.

856. Plaintiff was calmer than at prior appointments, but she was tearful, anxious, and depressed,

had poor insight, and had tangential conversation that was sometimes difficult to redirect. Tr.

856. Later that month, she reported that her depression and anxiety were getting worse. Tr. 845.

She reported that she used to have manic episodes that lasted for days, but more recently she had

episodes of crying and racing thoughts that lasted a few hours at a time. Tr. 845. Plaintiff was

calmer than her provider had ever seen her, and less tangential than usual, but had poor insight.

Tr. 846.

In August 2020, Plaintiff became upset and tearful with a provider, stating that her

partner and his family were against her. Tr. 715-716. She told her counselor that she was not

doing well. Tr. 807. In September and October 2010, Plaintiff's mental health provider wrote

that Plaintiff was inconsistent in reporting her emotional states and needs. Tr. 796, 801. She

alternated between failing to show up to appointments and leaving crisis voicemails requesting

support. Tr. 796, 801. Plaintiff did report doing better than she had in earlier sessions, saying she

was "doing great." Tr. 797, 802. In November 2020, Plaintiff reported that she woke up feeling

like she was not in control of her body. Tr. 826. Her mental status exam was unremarkable, but

she was noted to have depression and anxiety. Tr. 826.

In July 2021, Plaintiff reported that she was not feeling well; she was anxious and shaky and fatigued. Tr. 812. Her depression and anxiety were ongoing. Tr. 813. Her mental status exam was unremarkable. Tr. 814. In November 2021, a provider recorded that Plaintiff was anxious but her mental status was otherwise unremarkable. Tr. 1182.

Plaintiff correctly argues that the ALJ merely summarized the treatment record and that the summary was incomplete. Pl. Op. Br. 19, 20. The ALJ reviewed some of Plaintiff's medical records but provided no clear conclusion about whether or to what extent the findings were consistent with Plaintiff's testimony. Tr. 22-23. Plaintiff also correctly states that the record reflects waxing and waning symptoms. Pl. Op. Br. 19. Because mental health symptoms may wax and wane over time, the ALJ may not "pick out a few isolated instances of improvement . . . and [] treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, *759 F.3d 995, 1017 (9th Cir. 2014)*. To the extent that the ALJ relied on a few instances of improvement in September and October 2020, this was error. To the extent the ALJ relied on a few mental status exams showing a normal mood or normal speech, that was also error. The record shows no sustained improvement in Plaintiff's mental health. To the extent that the ALJ identified a couple of instances in which Plaintiff's concentration was normal, it does not constitute substantial evidence.

Finally, the ALJ noted that Plaintiff had a history of substance abuse and that she completed a course of treatment and was sober since January 2021. Tr. 23. Because there is no basis to conclude that the ALJ discounted Plaintiff's testimony based on her prior substance abuse, the Court declines to comment on this evidence.

//

//

II.    **Lay Witness Testimony**

"Lay testimony as to a claimant's symptoms is competent evidence that the Secretary must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you."). Under the 2017 regulations, the ALJ is not "required to articulate how [they] considered evidence from nonmedical sources" using the same criteria required for the evaluation of medical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d). Under the new regulations, however, the ALJ must still articulate their assessment of lay witness statements. *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F. Supp. 3d 858, 869 (D. Or. 2021).

The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine,* 574 F.3d at 694. But the ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114, *superseded on other grounds* by 20 C.F.R. § 404.1502(a). If the ALJ gives valid germane reasons for rejecting testimony from one witness, the ALJ may refer only to those reasons when rejecting similar testimony by a different witness. *Id.* Additionally, where "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," any error by the ALJ in failing to discuss the lay testimony is harmless. *Id.* at 1117, 1122.

In July 2019, Plaintiff's mother provided a written statement describing Plaintiff's symptoms and limitations. Tr. 271-278. She wrote that she saw Plaintiff about 20 hours a week. Tr. 271. She wrote that Plaintiff's mental health "limits her from reaching out or being in public

places because of mental trauma from past" and that Plaintiff has trouble trusting others. Tr. 271. She wrote that Plaintiff cared for her two children and her boyfriend by doing laundry, cooking meals, shopping, and making their beds. Tr. 272. Plaintiff was very good at cooking and could spend between 30 minutes and 3 hours cooking. Tr. 273. She could do household chores and spent two or three hours doing them about four times per week. Tr. 273. Plaintiff's mother also wrote that Plaintiff needed motivation to do chores: "if not, she is too depressed to care or her body is too sore to move." Tr. 273. Plaintiff sometimes did not care what her outfits looked like, rarely did her hair, and went days without showering. Tr. 272. She could eat "fine." Tr. 272.

Plaintiff's mother described Plaintiff as "very forgetful." Tr. 272. She needed reminders to take medicine but not to take care of personal needs and grooming. Tr. 273. She could handle money. Tr. 274.

Plaintiff's mother wrote that Plaintiff "used to be a people person" but no longer wanted to go out. Tr. 272. Plaintiff went out daily but did not drive. Tr. 273-274. She shopped in stores once or twice a month for about three or four hours. Tr. 274. Plaintiff's mother wrote that Plaintiff liked fishing with her family, swimming, and watching movies, and that Plaintiff tried to spend as much time with her family as possible. Tr. 275. She wrote that Plaintiff did these activities well, but that Plaintiff did not go out as much anymore and was usually sitting and looking depressed, and she cried a lot. Tr. 275. Plaintiff did not spend time with others. Tr. 275. She tried to do so when she felt like it, and then she would go to the lake with her family, to church, or to her sobriety meetings. Tr. 275. Plaintiff's mother also wrote that Plaintiff "has a major social problem," had become "more angry and unpredictable," and "has assaulted her family before." Tr. 275.

Plaintiff's mother indicated that Plaintiff's mental limitations covered memory, concentration, understanding, following instructions, completing tasks, and getting along with others. Tr. 276. She wrote that Plaintiff followed written instructions "great" and spoken instructions "good." Tr. 276. Plaintiff got along well with authority figures. Tr. 276. She was fired from a job about 20 years ago because she hit someone who was being sarcastic. Tr. 276. Plaintiff's mother wrote that Plaintiff did not handle stress or changes in routine well. Tr. 277. She wrote that Plaintiff was "always scared of dying." Tr. 277.

The ALJ stated that Plaintiff's mother made statements similar to Plaintiff's allegations and also stated that Plaintiff had trouble trusting others and needed reminders to take medication. Tr. 22. The Court notes that Plaintiff also stated that she needed reminders to take medication. Tr. 251. In terms of Plaintiff's adaptive functioning, the ALJ noted that Plaintiff's mother stated that Plaintiff could do chores and shop. Tr. 22. The ALJ failed to acknowledge the parts of the statement in which Plaintiff's mother explained that Plaintiff needed encouragement to do chores and that she did not bathe regularly or care about her appearance, and that she was nervous going out and did not like to go out as much anymore. But as stated above, the ALJ reasonably discounted the more extreme allegations Plaintiff and her mother made based on Plaintiff's report to Dr. Guthrie that she was independent in her activities of daily living.

In terms of Plaintiff's ability to focus and concentrate, the ALJ relied on Plaintiff's ability to do chores and handle money. Tr. 22. But Plaintiff's mother wrote that Plaintiff needed encouragement to do chores. And as stated above, it is unclear how Plaintiff's ability to count change or have a savings account undermines her testimony about her focus and concentration. But the ALJ reasonably noted that Plaintiff's mother stated that Plaintiff could follow instructions well. Tr. 22. As for social limitations, the ALJ relied on Plaintiff's mother's

statement that Plaintiff liked to fish, swim, watch movies, go to church, and go to the lake with her family. Tr. 22. The ALJ disregarded Plaintiff's mother's statement that Plaintiff no longer wanted to go out as much and often sat at home crying. Finally, the ALJ did not evaluate Plaintiff's mother's testimony about Plaintiff's difficulty trusting others or her statement that Plaintiff had become angrier and more unpredictable. Tr. 22.

Defendant argues that the ALJ reasonably discounted Plaintiff's mother's testimony for the same reasons she discounted Plaintiff's testimony. Def. Br. 7-8, ECF 12. Because the ALJ erred in discounting some of Plaintiff's testimony, the ALJ erred in discounting Plaintiff's mother's testimony to the extent it was similar. The ALJ also erred in failing to address Plaintiff's mother's testimony about Plaintiff's behavior and attitude toward others. These errors were not harmless.

**III.    Medical Opinion Evidence**

For claims filed on or after March 27, 2017, ALJs are no longer required to give deference to any medical opinion, including treating source opinions. Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important" factors in the evaluation process are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2). In doing so, the ALJ is required to explain how supportability and consistency were considered

and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

A.  Dr. Barsukov

Dr. Barsukov assessed Plaintiff's limitations in December 2020 upon reconsideration. Tr. 93-100. He assessed Plaintiff's depression, anxiety, and PTSD as severe. Tr. 93. He found Plaintiff moderately limited in the four broad functional areas. Tr. 94. In terms of memory, Dr. Barsukov opined that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures or remember and understand very short and simple instructions. Tr. 96. He found Plaintiff moderately limited in the ability to understand and remember detailed instructions. Tr. 96-97. He wrote that Plaintiff was "capable of understanding and remembering simple and routine tasks." Tr. 97. In terms of concentration, Dr. Barsukov found Plaintiff not significantly limited in the ability to carry out very short and simple instructions, to perform activities within a schedule and maintain regular attendance and punctuality, to sustain an ordinary routine without special supervision, to work in coordination or proximity to others without being distracted by them, to make simple work-related decisions, and to complete a normal workday without interruptions from her symptoms and perform at a consistent pace without unreasonable breaks. Tr. 97-98. He found Plaintiff moderately limited in the ability to

carry out detailed instructions and to maintain attention and concentration for extended periods. Tr. 97. He wrote that Plaintiff could "carry out simple and routine tasks without special instruction." Tr. 98.

As for social limitations, Dr. Barsukov opined that Plaintiff was not significantly limited in the ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 98-99. He found Plaintiff moderately limited in her ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 98-99. He wrote that Plaintiff could "have occasional public contact and occasional close coworker interaction." Tr. 99. Finally, for adaptive functioning, Dr. Barsukov found Plaintiff not significantly limited in her ability to be aware of normal hazards and take appropriate precautions and the ability to travel in unfamiliar places or use public transportation. Tr. 99. He found her moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. Tr. 99. He wrote that Plaintiff "needs additional time responding to work place changes" and "needs assistance setting goals." Tr. 99-100.

The ALJ found Dr. Barsukov's opinion "somewhat persuasive" because it was "somewhat consistent with the record and somewhat supported by the evidence cited." Tr. 24. The ALJ found the opinion persuasive as to the limitations to simple, routine tasks and occasional public contact and occasional close coworker interaction. Tr. 24. The ALJ then wrote that Dr. Barsukov "should have limited the claimant to making simple work-related decisions, performing work with few if any changes in the workplace, and never engaging in assembly line

pace work based on the evidence of perseverative thought process, labile affect, reported

hallucinations, limited or poor insight, paranoia, and anxiousness." Tr. 24. The ALJ concluded

that "[t]hese limitations better capture the claimant's difficulties in adapting to and handling

stress in the workplace." Tr. 24. The ALJ also wrote:

> Further, there is evidence of adequate and appropriate appearance and grooming,
> good insight and good judgment, no suicidal ideation and homicidal ideation, no
> delusions, persecutions, or obsessions, normal mood and affect, and adequate
> interpretations of proverbs and adequate responses to questions testing judgment
> that is inconsistent with a limitation providing assistance in setting goals and in
> providing additional time when responding to workplace changes.

Tr. 24 (citing Tr. 322, 612-613, 814, 826, 833, 838, 1160). Thus, the ALJ rejected Dr.

Barsukov's opinion only as to Plaintiff's limitations in adaptive functioning.

Plaintiff argues that the ALJ failed to explain how the normal mental status exam

findings undermine Dr. Barsukov's opinion that Plaintiff needs more time to respond to

workplace changes and assistance setting goals. Pl. Op. Br. 7. She argues that the evidence the

ALJ relied on in assessing the opinion, including Plaintiff's impaired memory, deficits in general

knowledge, the need for repetition in instruction, perseverative thought process, tangential

conversation, the need for redirection, paranoid thinking, rapid speech, anxiousness, agitation,

tearfulness, depression, lability, and mood swings, supports Dr. Barsukov's opinion. *Id.* at 7-8

(citing Tr. 24). Plaintiff argues that the ALJ's reliance on some normal objective findings is also

erroneous because the record reflects many abnormal objective findings as well. *Id.* at 8.

Defendant counters that the ALJ accounted for Dr. Barsukov's findings with slightly

different limitations in the RFC. Def. Br. 11. The ALJ limited Plaintiff to few if any workplace

changes and simple work-related decisions. *See id.* But Defendant does not explain how the

normal mental status exam findings on which the ALJ relied in rejecting Dr. Barsukov's

proposed limitations undermine those limitations. *See id.* at 12. The Court agrees with Plaintiff.

The ALJ failed to explain how findings such as a lack of homicidal or suicidal ideation or an adequate interpretation of proverbs undermine Dr. Barsukov's opinion that Plaintiff needed more time to respond to workplace changes. No such contradiction is apparent to the Court. As for Defendant's suggestion that the limitations the ALJ assessed were similar enough, there is a difference between the frequency of workplace changes and the amount of time needed to respond to workplace changes. As Plaintiff points out, the VE testified that a person who needed additional time to respond to workplace changes would not be competitively employable. Tr. 64. The ALJ harmfully erred in rejecting Dr. Barsukov's opinion about Plaintiff's adaptive limitations.

    B.  Dr. Guthrie

    Dr. Guthrie performed a consultative psychological evaluation of Plaintiff on October 2, 2021. Tr. 1158. She wrote that Plaintiff's appearance, dress, and grooming were appropriate, as were Plaintiff's attitude and cooperation. Tr. 1158. However, Plaintiff "did appear highly anxious, stuttered intermittently, spoke rapidly, and continued to apologize stating that she has a difficult time speaking when anxious." Tr. 1158. Dr. Guthrie found Plaintiff's report of her history reliable. Tr. 1158. Plaintiff reported that she would get bad feelings out in public, feel that she would be harmed, and get shaky and anxious. Tr. 1158. Plaintiff reported suffering from nightmares, re-experiencing trauma, avoidance, hypervigilance, poor sleep, elevated appetite, worry that someone had done something to her food, hearing voices, wondering if her father was trying to communicate with her, poor energy, poor concentration, poor memory, occasional panic attacks, depression, hopelessness, and feelings of worthlessness. Tr. 1158. She reported that she was taking methadone to treat her opioid dependence. Tr. 1158. Plaintiff reported periods of auditory and visual hallucinations. Tr. 1159. She ingested a bottle of ibuprofen in her

teens to see what would happen, but did not want to kill herself. Tr. 1159. She said that she felt mild improvement in her conditions over the years. Tr. 1159. She had tried numerous medications, and none helped much other than Wellbutrin. Tr. 1159.

Plaintiff reported a history of abuse and a few short periods of incarceration. Tr. 1159. Her father had mental health issues and both parents were alcoholics. Tr. 1159. She lost jobs in the past because she felt like she was being attacked by coworkers. Tr. 1159. Plaintiff reported that she went to a counseling program but mostly watched TV and slept. Tr. 1160. She used to like going to the beach but no longer went. Tr. 1160. She liked spending time with her children. Tr. 1160. She reported that she could do her activities of daily living independently, but she sometimes struggled and panicked when going out in public. Tr. 1160. She reported having a low tolerance for distress and suffering from hypervigilance. Tr. 1160. She could be triggered to panic, and then she would have tunnel vision and not think straight. Tr. 1160. She had some trouble with spoken instructions and could not follow written instructions on her own. Tr. 1160. She could handle money other than checks. Tr. 1160. She handled stress poorly. Tr. 1160. She did not trust others and was socially isolated. Tr. 1160. Dr. Guthrie found Plaintiff "highly anxious and labile." Tr. 1160.

On the mental status exam, Plaintiff's manner and approach to evaluation were appropriate. Tr. 1160. She was cooperative but somewhat hyperverbal. Tr. 1160. Her stream of mental activity was spontaneous. Tr. 1160. Her mood was "OK" and her affect was labile. Tr. 1160. She had appropriate eye contact and expressive and receptive language, but she stuttered and almost hyperventilated as she got anxious. Tr. 1160. She had hallucinations but denied suicidal ideation. Tr. 1160. Her judgment and insight were good. Tr. 1160. Her thought process and content were normal. Tr. 1160-1161. She was oriented. Tr. 1161. She missed one of three

words on immediate recall, could remember what she had for dinner the night before, and remembered where she went to elementary school. Tr. 1161. She struggled to name three large cities in the United States and became tearful, and ultimately named Eugene as a large city. Tr. 1161. She struggled some with basic calculations. Tr. 1161. She struggled to spell "ocean" backward but was ultimately successful. Tr. 1161. She could understand proverbs. Tr. 1161.

Dr. Guthrie diagnosed Plaintiff with PTSD, stimulant use disorder (in remission), opioid use disorder (in remission), and probable borderline personality disorder (BPD). Tr. 1162. Dr. Guthrie opined that Plaintiff "has significant limitations in social skills/interactions due to past trauma and resulting hypervigilance." Tr. 1162. Plaintiff made errors on the mental status exam based on her anxiety. Tr. 1162. Dr. Guthrie thought that Plaintiff's hallucinations could be caused by prior methamphetamine use rather than a thought disorder, but were more likely due to PTSD and BPD. Tr. 1162.

Dr. Guthrie concluded that Plaintiff was mildly impaired in her ability to understand, retain, and follow instructions. Tr. 1162. Plaintiff was impaired in her ability to sustain attention to perform simple, repetitive tasks. Tr. 1162. She was impaired in her ability to relate to others. Tr. 1163. She was impaired in her ability to tolerate the stress associated with daily work activity. Tr. 1163. Dr. Guthrie concluded that Plaintiff could not work because of "the degree of her mental health symptoms," but that she might be able to work in the future if she received treatment. Tr. 1163.

Dr. Guthrie assessed no limitation in Plaintiff's ability to carry out simple instructions; mild limitations in her ability to understand and remember simple instructions, make judgments on simple work-related decisions, and make judgments on complex work-related decisions. Tr. 1165. She assessed moderate limitations in Plaintiff's ability to understand, remember, and carry

out complex instructions. Tr. 1165. She wrote that during her interview with Plaintiff, she had to repeat questions multiple times and that Plaintiff had trouble understanding and remembering one- and two-part tasks. Tr. 1165.

Dr. Guthrie assessed moderate limitations in Plaintiff's ability to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to usual work situations and changes in a routine work setting. Tr. 1166. She wrote that Plaintiff described a low distress tolerance and that this was evident in the interview, as Plaintiff was hyperverbal, anxious, and stuttering. Tr. 1166. She also wrote that Plaintiff had trust issues and interpersonal difficulties due to the severity of her PTSD. Tr. 1166. Dr. Guthrie found Plaintiff's concentration mildly impaired on interview. Tr. 1166.

Dr. Guthrie wrote that some of Plaintiff's presentation might be due to treatment of her opioid use disorder: methadone could affect concentration, understanding, and retention of information. Tr. 1166. She wrote that Plaintiff "should absolutely remain on it to prevent relapse." Tr. 1166.

> The ALJ found Dr. Guthrie's opinion not persuasive. Tr. 24. She wrote that the opinion
>
> presents several concerning internal inconsistencies. First, Dr. Guthrie identified moderate limitations in the claimant's ability to carry out complex instructions, but then wrote separately that the claimant only had mild impairments in concentration during the interview. (Ex. 14F). Second, Dr. Guthrie identified only moderate limitations throughout the functional categories, but found that the claimant would not be able to maintain employment. (*Id.*). The form defines moderate limitations as limitations that would cause functioning to be fair. This level of functioning is not consistent with an inability to perform work. Further, the statement that the claimant would be unable to perform work is reserved to the Commissioner.

Tr. 24.

Plaintiff argues that the inconsistencies the ALJ identified are not inconsistencies. Pl. Op. Br. 12-13. As to the first contradiction the ALJ noted, Plaintiff points out that Dr. Guthrie

explained that she found Plaintiff more limited in the ability to understand, remember, and carry out complex tasks because she had to repeat questions to Plaintiff multiple times during the clinical interview. *Id.* at 12 (citing Tr. 1165). Plaintiff is correct. Dr. Guthrie wrote that she had to repeat questions to Plaintiff multiple times and that Plaintiff had trouble understanding and remembering one- to two-part tasks. Tr. 1165. Based on this difficulty, Dr. Guthrie reasonably concluded that while Plaintiff was only mildly limited in her ability to understand and remember simple instructions, she would be moderately limited in her ability to understand, remember, and carry out complex instructions. Tr. 1165. There is no contradiction between the assessment and the clinical interview. Plaintiff also correctly points out that the ALJ limited Plaintiff to simple, routine, repetitive tasks, which appears consistent with Dr. Guthrie's opinion. Pl. Op. Br. 12-13.

As to the second contradiction the ALJ identified, Plaintiff argues that "the ALJ selectively focused on the check-box portion of Dr. Guthrie's opinion to dismiss the full context of conclusions and narrative responses." *Id.* at 13. Dr. Guthrie concluded that Plaintiff could not work based on "the degree of her mental health symptoms." Tr. 1163. Dr. Guthrie focused on Plaintiff's labile mood, high level of anxiety, and chronic intermittent hallucinations, as well as her social limitations. Tr. 1162. Plaintiff argues that Dr. Guthrie's assessment of Plaintiff's ability to work was not based on "the degree of impairment at each individual functional category, but, rather, the overall impact of [Plaintiff's] mental illness on her ability to *sustain* performance in a vocational setting." Pl. Op. Br. 13. Plaintiff is correct. While a finding of two marked limitations or one extreme limitation satisfies the "paragraph B" criteria, *see* Tr. 19, a failure to satisfy the "paragraph B" criteria does not show that an individual is not disabled. It only means that the individual's impairment does not meet or equal a listed impairment. *See* Tr. 19. The Ninth Circuit has not held that moderate mental limitations are not disabling. *See Barney*

*v. Kijakazi*, No. 1:22-CV-00414-GSA, 2023 WL 3581412, at *8 (E.D. Cal. May 22, 2023)

(noting a lack of binding precedent on this issue). A combination of functional limitations in an

RFC based on moderate mental limitations could result in a finding of disability, particularly

where, as here, the claimant has moderate limitations in all four functional areas. There is no

inherent contradiction between moderate mental limitations and an inability to work.

Next, Plaintiff argues that the ALJ erred in rejecting Dr. Guthrie's opinion because it

stated a conclusion on the ultimate issue of disability. Pl. Op. Br. 13. Plaintiff correctly states

that "Dr. Guthrie did not simply make a conclusory statement of disability; instead, she offered

an assessment, based on objective medical evidence, of [Plaintiff's] likelihood of being able to

sustain full-time employment given the many mental impairments she faced." *Id.* In rendering a

medical opinion, a doctor may opine on the ultimate issue of the claimant's ability to work.

*Garrison*, 759 F.3d at 1012, 1014 (assessing medical opinion stating that claimant's prognosis

for returning to work was poor and that claimant had inadequate ability to perform work-related

tasks based on her cognitive functioning). Plaintiff concedes that Dr. Guthrie's opinion that

Plaintiff is disabled is not binding on the Commissioner. Pl. Op. Br. 13. But an ALJ may not

reject an opinion simply because it opines on the ultimate issue of disability. The ALJ did

provide reasons to reject Dr. Guthrie's opinion, but those reasons were erroneous. Dr. Guthrie's

opinion was not internally inconsistent.

Finally, Plaintiff asserts that the ALJ failed to articulate her assessment of the

supportability and consistency of Dr. Guthrie's opinion. Pl. Op. Br. 14. Plaintiff is partially

correct. The ALJ noted two purported internal inconsistencies in the opinion, which addressed

the supportability of the limitations Dr. Guthrie assessed. But the opinion was not internally

inconsistent. And Defendant concedes that the ALJ did not address the consistency of the

opinion with the record. Def. Br. 9-10. Defendant argues that the error was harmless because the ALJ need only evaluate the persuasiveness of a medical opinion, and Dr. Guthrie's conclusion that Plaintiff could not work, the conclusion the ALJ rejected, was not a medical opinion. *Id.* at 10. The Court disagrees.

The regulations describe three categories of medical evidence. First is objective medical evidence, which includes "medical signs" and "laboratory findings." 20 C.F.R. § 404.1513(a)(1). "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Second is a medical opinion, which "is a statement from a medical source about what [a claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions in" specified areas. *Id.* § 404.1513(a)(2). One such area is the "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." *Id.* § 404.1513(a)(2)(ii). The third category is "other medical evidence," which includes "judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 404.1513(a)(3).

Dr. Guthrie described Plaintiff's symptoms, concluded that they caused limitations, stated the degree of limitation, and opined that based on her symptoms, Plaintiff could not work. Dr. Guthrie opined that Plaintiff had moderate functional limitations. Tr. 1165-1166. The ALJ also assessed moderate functional limitations. Tr. 19-20. The ALJ only rejected Dr. Guthrie's

conclusion that Plaintiff could not work. Dr. Guthrie stated that the degree of Plaintiff's

symptoms precluded work. Tr. 1163. Dr. Guthrie explained the evidence supporting her

conclusion. Tr. 1162-1163. The opinion that Plaintiff could not work was part of Dr. Guthrie's

medical opinion. Although Defendant disagrees, the Court found no controlling authority

holding otherwise under the current regulations. The ALJ was required to assess the consistency

of Dr. Guthrie's opinion and failed to do so.

## IV.    Nature of Remand

The ALJ partially erred in discounting the testimony of Plaintiff and her mother and erred

in assessing the medical opinions of Dr. Barsukov and Dr. Guthrie. Plaintiff asks the Court to

credit the evidence as true and remand for an award of benefits. Pl. Op. Br. 21; Pl. Reply 3-6,

ECF 13. Defendant argues that a remand for further proceedings is more appropriate. Def. Br.

12-13. The Court concludes that the case should be remanded for further proceedings.

To determine whether it is appropriate to remand for payment of benefits or for further

proceedings, the Ninth Circuit uses a three-part test. *Garrison*, 759 F.3d at 1020; *Treichler v.*

*Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014). First, the ALJ must fail to

provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical

opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed, and further

administrative proceedings would serve no useful purpose. *Id.* Third, if the Court remands the

case and credits the improperly discredited evidence as true, the ALJ would be required to find

the claimant disabled. *Id.* To remand for an award of benefits, each part of the test must be

satisfied. *Id.* The "ordinary remand rule" is "the proper course," except in rare circumstances.

*Treichler*, 775 F.3d at 1099-100. In deciding whether to remand for further proceedings or

payment of benefits, the district court should consider whether the claimant's testimony was

inconsistent with the medical evidence, or whether the government has pointed to evidence that the ALJ overlooked. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015).

The first requirement is met. Defendant argues that the second requirement is not met because "Plaintiff's activities, treatment record, as well as the moderate mental limitations assessed by Dr. Guthrie and the State agency psychological consultants, all create serious doubt that Plaintiff is disabled." Def. Br. 13 (footnote omitted). Defendant points out that Dr. Guthrie assessed moderate mental limitations but found Plaintiff unable to work, while the State agency psychological consultants assessed moderate mental limitations but found that Plaintiff would be able to work. *Id.* at 13 n.5. Defendant also acknowledges that the VE testified that the limitations Dr. Barsukov assessed would preclude employment. *Id.* Plaintiff counters that Defendant is merely restating arguments already made and fails to point to anything in the record the ALJ overlooked. Pl. Reply 6.

The Court declines to remand for an award of benefits. There are still doubts as to whether Plaintiff is disabled. As to Plaintiff's testimony and her mother's testimony, Plaintiff asserts that it supports a finding that she could not maintain work-appropriate behavior and would be absent and off-task more than employers would tolerate. Pl. Op. Br. 20-21 (citing Tr. 62-63). The VE testified that being absent more than one day per month on an ongoing basis or being off-task more than 15% of the time would preclude employment. Tr. 62-63. The VE also testified that an individual who was occasionally verbally argumentative with coworkers or supervisors would not be employable. Tr. 62-63. The Court concludes that the testimony of Plaintiff and her mother does not establish these limitations such that further proceedings are not needed. Plaintiff and her mother both testified that Plaintiff got along well with authority figures. Tr. 254, 276. Plaintiff's mother testified that Plaintiff was fired for hitting a coworker around 20

years ago. Tr. 276. And Plaintiff did not testify that she left her job as a telemarketer because of attitude or inability to get along with others; she testified that she could not understand and carry out instructions well enough to do the work. Tr. 55-56. As for the off-task and absenteeism limitations, the record does not conclusively establish that they apply.

With respect to Dr. Guthrie's opinion, Plaintiff asks the Court to credit as true the opinion that the severity of Plaintiff's mental conditions prevents her from working. Pl. Op. Br. 14-15. The Court does not believe it is appropriate on this record to direct a conclusion on the ultimate issue of disability based on Dr. Guthrie's opinion. The ALJ did not assess the consistency of the opinion, so the analysis is incomplete, and the record does not conclusively establish that Plaintiff cannot work. Finally, Dr. Barsukov's assessed limitation that Plaintiff needed more time to respond to workplace changes would, if credited, compel the conclusion that Plaintiff is disabled. Tr. 64. The ALJ limited Plaintiff to "few if any changes in the workplace." Tr. 21. It is unclear whether Plaintiff would need more time to respond to workplace changes if there were very few changes. In sum, a remand is needed to address the improperly discredited evidence.

CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for administrative proceedings.

IT IS SO ORDERED.

DATED:    February 9, 2024    .


MARCO A. HERNÁNDEZ
United States District Judge